IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

CATHERINE LAWTON,

                Plaintiff,

     v.                                8:08-CV-00137 (LEK/DEP)

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

_____

APPEARANCES:                 OF COUNSEL:

FOR PLAINTIFF:

LEGAL AID SOCIETY          MARY M. WITHINGTON, ESQ.
OF NORTHEASTERN NEW YORK
112 Spring Street
Suite 109
Saratoga Springs, New York 12866

FOR DEFENDANT:

HON. ANDREW T. BAXTER     SOMMATTIE RAMRUP, ESQ.
UNITED STATES ATTORNEY     Assistant U.S. Attorney
NORTHERN DISTRICT OF NEW YORK
Post Office Box 7198
100 South Clinton Street
Syracuse, New York, 13261-7198

OFFICE OF THE GENERAL COUNSEL  BARBARA L. SPIVAK, ESQ.
Region II                   Chief Counsel
26 Federal Plaza - Room 3904
New York, New York 10278

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

Plaintiff Catherine Lawton, who suffers from several diagnosed conditions including principally fibromyalgia, gastroesophageal reflux disease ("GERD"), chronic obstructive pulmonary disease ("COPD") and reduced intellectual functioning, commenced this proceeding pursuant to 42 U.S.C. § 405(g) seeking judicial review of the denial of her application seeking supplemental security income ("SSI") benefits under the Social Security Act ("Act").  In support of her challenge, plaintiff asserts that the determination of the administrative law judge ("ALJ") assigned to hear and determine the matter upon which the denial hinges, to the effect that she was not disabled at any relevant point in time, is not supported by substantial evidence in the record, and resulted from both the improper rejection of contrary opinions of her treating physicians and the ALJ's failure to consider the cumulative effects of all of her conditions.  As relief, plaintiff seeks an order reversing the Commissioner's determination and directing a finding of disability and a corresponding remand to the agency for the calculation of benefits owing or, in the alternative, vacating the ALJ's decision and remanding the matter for further consideration by the

2

agency on the merits.

Having reviewed the record now before the court, considered in light of the parties' respective contentions, I am unable to conclude that the determination of no disability is supported by substantial evidence, given the existence of a critical void in the record concerning the extent of plaintiff's physical limitations.

I.    BACKGROUND

Plaintiff was born in June of 1959, and was forty-seven years old at the time of the issuance of the ALJ's decision in this matter. Administrative Transcript at pp. 82, 429, 454.[1]  Plaintiff attended regular school classes through the tenth grade, but at that point dropped out without attaining either a high school degree or a general equivalency diploma ("GED"), and has not otherwise received any further formal educational training.  AT 430, 447, 454, 471.  Ms. Lawton is divorced with three adult children, and is a resident of Fort Ann, New York.  AT 343, 430-31, 454; *see also* Complaint (Dkt. No. 1) ¶ 4.

Aside from brief periods of casual employment as a cashier at a

---

[1]      Portions of the administrative transcript (Dkt. No. 8), which was compiled by the Commissioner and is comprised in large part of the medical records and other evidence which was before the agency when its decision was made, will be cited hereinafter as "AT ___."

McDonald's restaurant for one week in 1992, as a restaurant dishwasher for one week in 1995, and at a vegetable stand for two weeks during 1999, plaintiff has not worked since 1991.  AT 114.  Prior to that time plaintiff was employed in various settings as a hotel/motel housekeeper, a position which required her to clean rooms, make beds, climb stairs and push laundry carts and utility carts, and entailed constant standing, as well as frequent bending, lifting, pushing and pulling.  AT 114-15, 433.  Plaintiff claims to have suffered a disabling injury to her lower back while lifting a stack of trays at McDonald's in 1992, resulting in numbness to her hands and a burning sensation in her back.  AT 114, 434.

Plaintiff received medical treatment for her conditions from Dr. Maurice Wiart, of the Whitehall Health Center ("Center"), dating back to 1994.  AT 155-184.  During many of her visits to the Center, Dr. Wiart examined plaintiff and assessed her employability for purposes of receiving social services benefits.  *See*, *e.g.* AT 159-66.  Treatment notes from July 14, 1995 reflect Dr. Wiart's opinion that he could not "document [a] physical basis for [plaintiff] not being employable."  AT 165.  Notes from August 6, 1996 and of November 8, 1996 reveal Dr. Wiart's approval of plaintiff for light duty work.  AT 159-60.

4

Plaintiff has also treated with David G. Welch, M.D., at Adirondack Rehabilitation Medicine, P.C., located in Queensbury, New York, dating back at least to July 20, 1998.[2]  AT 151-54.  In notes of a visit on July 20, 1998, Dr. Welch recorded that plaintiff continued to experience pain and discomfort, and that she could walk for no more than twenty to thirty minutes at one time.  AT 154.  Dr. Welch noted that plaintiff was taking ten milligrams ("mg") of Baclofen[3] four times per day and five milligrams of BuSpar[4] twice each day, and opined that this combination of medications seemed to be effective in addressing her cramping and anxiety.  *Id*.  The doctor further  noted that Ms. Lawton was neurologically intact but "somewhat dulled in her responses and seemingly quite distracted[,]" and attributed her dulled responses to a form of fibromyalgia.  *Id.*  Dr. Welch concluded that the prognosis for short-term recovery was poor, but that if

---

[2]      The records regarding treatment of the plaintiff by Dr. Welch appear to be incomplete.  The earliest recorded visit to that physician referenced in the record occurred on July 20, 1998.  AT 154.  That report, however, plainly reflects that plaintiff saw Dr. Welch on other, earlier occasions.  *See id.*

[3]      Baclofen is prescribed as a muscle relaxant and antispastic in the treatment of spasticity of spinal origin, including multiple sclerosis and spinal cord injury.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 193 (31st ed. 2007).

[4]      BuSpar is a preparation of buspirone hydrochloride, an anti-anxiety agent used in the treatment of anxiety disorders and for short-term relief of anxiety symptoms.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 269 (31st ed. 2007).

plaintiff adhered to a light exercise program, then she might be expected

to progress to a point where she could engage in very light or sedentary

work.  *Id.*  Dr. Welch went on to observe that a referral to Vocational and

Educational Services to Individuals with Disabilities ("VESID")[5] for

vocational retraining could enhance plaintiff's prospects for returning to

the workforce, though adding that she could handle no more than one to

two hours per week of vocational training-related activities and that she

otherwise remained totally disabled.  *Id*.

Plaintiff again treated with Dr. Welch on October 20, 1998.  AT 153.

In his report of that visit Dr. Welch noted that plaintiff had a clear spasm

running the entire length of her back on the right side, with an

accompanying decline in function and range of motion.  *Id.*  The doctor

also noted that he had given plaintiff a note withdrawing her from a work

fair job, which entailed working as a food service helper at a senior center

and had aggravated her symptoms. *Id.*  As a result of that visit, Dr. Welch

increased plaintiff's prescription dosage of Baclofen to fifteen milligrams

---

[5]      VESID, an office of the New York State Education Department, offers disabled New Yorkers the opportunity to become independent through education, training and employment and provides vocational rehabilitation services to eligible individuals to prepare them for suitable jobs. http://www.vesid.nysed.gov/do/handbook.htm (site last visited May 6, 2009).

three times per day, and maintained her BuSpar prescription.  AT 153.

Plaintiff's next consultation with Dr. Welch occurred on December 16, 1998.  AT 152.  On that occasion, Dr. Welch observed that plaintiff looked better than during her previous office visit.  *Id.* In his notes of that session Dr. Welch  described continued evidence of fibromyalgia, noting significant trigger point activity in plaintiff's upper back.  *Id*.  Dr. Welch observed that while plaintiff's neck was looser, its range of motion was somewhat limited, adding that her upper reflexes were intact and characterizing her strength as 3.5/5 bilaterally.  *Id.*  Dr. Welch noted plaintiff's continued tolerance of Baclofen and BuSpar, and discussed a series of rehabilitative exercises with plaintiff.[6]  *Id.*  In his notes of that visit Dr. Welch opined that plaintiff could perform only light, very sedentary part-time work.  *Id*.

Plaintiff's last reported visit with Dr. Welch occurred on February 16, 1999.  AT 151.  On that occasion Dr. Welch noted that an examination revealed bilateral trigger point activity across her upper back, neck and shoulder areas.  *Id.*  The doctor continued plaintiff's prescriptions for

---

[6]       According to notes of an office visit on May 2, 2005 plaintiff informed her then-treating physician that she had not taken "these kinds of meds [sic]" for four to five years.  AT 211.

Baclofen and BuSpar, and continued her restriction to no more than two pounds of pushing, pulling or lifting and noted that such a restriction would allow her to engage only in very sedentary part-time work.  *Id.*  Dr. Welch went on to note that he doubted whether sedentary, part-time work was a realistic goal in light of plaintiff's learning disabilities, and recommended that plaintiff participate in a VESID program offering training to perform light-weight, non-repetitive menial tasks. *Id.*  At the end of that visit Dr. Welch encouraged plaintiff to check with him in three months, "or as needed."[7]  *Id.*

At the time of the first hearing in this matter, plaintiff had recently changed her primary care provider from the Whitehall Health Center, where Dr. Wiart was listed as her primary physician, to Mettowee Valley Family Health Center, where Carl Beckler, M.D. assumed the role as her primary physician.  AT 205-09, 340, 373-97, 457.  The records from both health centers detail plaintiff's continued fibromyalgia-related symptoms.  AT 156-184, 205-19, 222, 226, 229, 340, 373-97.  Plaintiff testified that she treated with Dr. Beckler as needed, but that he had not been of much

---

[7]     During the hearing held in this matter plaintiff testified that she was not then receiving treatment for fibromyalgia.  AT 458, 460-61.

help to her.[8]  AT 435-36.

Plaintiff was seen by Dr. Beckler on April 14, 2005, at which time he observed that there was some discomfort involving plaintiff's lower back and the lateral aspect of her right hip.  AT 209-10.  Dr. Beckler further noted that there was "tenderness to palpation over the entire thoracic [and] lumbar spine along the paraspinal, thoracic [and] lumbar muscles."[9] AT 210.  The doctor noted that he could barely touch her; "she seemed to jump [and] twist [and] writhe in pain."  AT 210.  Other trigger points over plaintiff's chest and upper back, however, were only slightly tender.  *Id*. Dr. Beckler reported that plaintiff's gait was normal, and diagnosed her as suffering from right trochanteric bursitis, fibromyalgia, COPD secondary to smoking, and allergic rhinitis.  *Id.*  Dr. Beckler suggested that plaintiff try other non-steroidal anti-inflammatory drugs, but plaintiff declined and stated that she wanted Darvocet.[10]  *Id.*  Dr. Beckler explained that in his

_____

[8]     The hearing transcript refers to a "Dr. Carl Butler", but notes that the spelling was phonetic.  AT 435.  Given all of the circumstances and the context of plaintiff's testimony, the court surmises that plaintiff was referring to Dr. Beckler in her testimony.

[9]     A part of the subjective portion of Dr. Beckler's treatment notes appears to have been omitted in the court's copy of the record.  *See* AT 209-10.

[10]     Darvocet is a preparation of the napsylate salt of propoxyphene, an opioid analgesic structurally related to methadone, and acetaminophen used for pain relief.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 479, 1551 (31st ed. 2007).

opinion her examination did not warrant a prescription for any narcotics, and suggested to plaintiff as an alternative that an injection with Depo-Medrol[11] and Xylocaine[12] would be helpful for her bursitis; plaintiff flatly refused the suggested treatment, however, and reiterated her preference for Darvocet.  AT 210-11.  Dr. Beckler noted that at that point in the discussion plaintiff became rather agitated, asserted that she was not a drug abuser, and "stalked out of the office."  AT 211.

On September 23, 2005, plaintiff complained to Dr. Beckler of pain in her lower back radiating into her legs.  AT 340-41.  Dr. Beckler noted that plaintiff had undergone an "extensive work-up including arthritis profiles and ESR [erythrocyte sedimentation rate][13] and Lyme titer all of which [were within normal limits]."  AT 340.  Dr. Beckler also reported that plaintiff needed a disability form completed and that she "had disability for

---

[11]    Depo-Medrol is a preparation of methylprednisone acetate, administered by intraarticular, intramuscular, intralesional or soft-tissue injection as an anti-inflammatory and immunosuppressant in a wide variety of disorders.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 499, 1171 (31st ed. 2007).

[12]    Xylocaine is a preparation of lidocaine, a drug having anesthetic, sedative, analgesic, anticonvulsant and cardiac properties and used as a local anesthetic.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 1048, 2116 (31st ed. 2007).

[13]    Erythrocyte sedimentation rate is the rate at which erythrocytes precipitate out from a well-mixed specimen of venous blood, measured by the distance the top of the column of erythrocytes falls in a given time interval under specified conditions.  An increased rate may indicate, *inter alia*, inflammatory disease.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 1618 (31st ed. 2007).

quite some time . . . [and] in addition she has signif[icant] mental handicaps . . . [which] make it difficult for her to be employable."[14]  AT 340.  The doctor further noted that plaintiff was able to walk on her toes and heels with some difficulty, and that her ambulation was normal.  *Id.*

In addition to being treated for symptoms of fibromyalgia, plaintiff has suffered from esophageal issues.  On August 3, 2002, plaintiff presented to Dr. David R. Kelly complaining that her throat felt as though it were "squeezing on and off."  AT 189.  Dr. Kelly noted that plaintiff's airway appeared normal, that there was no retropharyngeal or precervical soft tissue swelling and that her epiglottis and aryepiglottic folds were not enlarged.  *Id*.

On December 27, 2003, James E. Bell, M.D., noted that a

---

[14]      The court's copy of Dr. Beckler's office note from September 23, 2005 is illegible in two areas which each appear to encompass two or three words.  The document in question is a poor photocopy of what appears to be a facsimile.  *See* AT 340.  The wording suggested by plaintiff's brief, to the effect that "[i]t is difficult for her physically to do work, but in addition she has signif. mental handicaps with *a total IQ of 80,* verbal IQ of 67".  *See* Plaintiff's Brief (Dkt. No. 10) at p. 14, is plausible.  Although courts have remanded social security appeals cases for an ALJ's failure to clarify the content of illegible treatment notes, *see, e.g., Jackson v. Barnhart*, No. 06-CV-0213, 2008 WL 1848624, at *8 (W.D.N.Y Apr. 23, 2008) (adopting recommendation that case be remanded to reconsider findings after clarifying content of illegible treatment records), defendant did not contest the wording suggested by plaintiff, part of which finds conclusive support in the record. *See* AT 423 (specifying plaintiff's total IQ as 80 and verbal IQ as 67).  Moreover, in light of the plausible and uncontested suggested wording, the minimal illegible portion does not interfere with comprehension of the testimony to an extent that would hinder fair review.  *Ward v. Heckler*, 786 F.2d 844, 848 (8th Cir. 1986).

radiograph of plaintiff's chest revealed "[s]ubtle atelectatic versus infiltrative changes right middle lobe . . . . [but that] [t]he lungs otherwise appear[ed] clear.  The cardiomediastinal silhouette [was] within normal limits."  AT 188.

On December 3, 2005, plaintiff underwent testing for dysphagia, heartburn and GERD at the Glens Falls Hospital.  AT 352.  Thomas A. Quaresima, M.D., reported that plaintiff presented with a strong history for GERD and noted "smooth, thickened folds crossing the EG junction," which he opined were inflammatory polyps.  AT 352.  Dr. Quaresima further noted a small amount of gastroesophageal reflux upon performance of a water siphonage test.  AT 352-53, 396-97.  Jacki Becker, plaintiff's nurse practitioner at the Mettowee Family Health Center, noted on December 13, 2005, that she had referred plaintiff to Steven Karp, M.D., who performed a Barium swallow test and diagnosed her with GERD.  AT 384.

Apparently in light of ongoing complaints of dysphagia, on July 26, 2006, Howard P. Fritz, M.D., performed an endoscopy on plaintiff.  AT 370.  Dr. Fritz concluded that the examination was normal to the third part

of plaintiff's duodenum.[15]  *Id.*  Dr. Frtiz recommended that plaintiff stop smoking, adhere to dietary restrictions and receive anxiety treatment.  AT 368-70.

In addition to plaintiff's physical conditions, the record contains indications that plaintiff suffers from some limitations in her intellectual functioning.  Patricia Henel, Ph.D., a licensed psychologist, consultatively examined the plaintiff and administered an intelligence test to her on November 11, 1998.  AT 422-24.  The results of that testing revealed a verbal intelligence quotient ("IQ") score of 67, a performance IQ score of 80 and a full-scale score of 71.  AT 423.  Dr. Henel opined that the thirteen point margin between plaintiff's verbal and performance score indicated the existence of a language-based learning disability.  AT 423-24.  Dr. Henel found that plaintiff's global assessment of functioning ("GAF") was sixty, and characterized plaintiff's overall level of cognitive

---

[15]      The court's copy of Dr. Fritz's report to Dr. Karp appears to be incomplete, as his narrative letter seems to end prematurely.  *See* AT 367-68.  Neither party argued, however, that the apparent omission deprived the court of a meaningful review, and the court finds no cause to find otherwise.  *Cf. Ward v. Heckler*, 786 F.2d 844, 848 (8th Cir. 1986) (explaining that small gaps in a hearing transcript did not interfere with comprehension of the testimony to an extent that would hinder fair review).

ability as borderline.[16]  AT 423.

Plaintiff was examined on June 25, 2004 by Michael G. Holland, M.D., an orthopedic consultant.  AT 190-91.  In reviewing plaintiff's medical records, Dr. Holland observed that she had a long history of fibromyalgia, but was not then receiving any treatment.  AT 190.  Dr. Holland noted that examination-related testing was "extremely limited" due to plaintiff's refusal "to do most of the things" he asked of her, including seating herself on the examination table.  AT 191.  Dr. Holland noted that plaintiff had "pain with just the slightest cutaneous stimulation overlying most her areas."  *Id*.  Dr. Holland further noted plaintiff's refusal to attempt either forward or deep-knee bends or to hop on either foot, and that plaintiff's heel-to-toe walking strength was intact.  *Id.*  Dr. Holland reported that plaintiff's straight leg raising was negative bilaterally, that her sensory examination was intact and that her station and gait were normal.  *Id.*  Dr. Holland observed that plaintiff's  range of motion in her hips was normal, but that she grimaced in pain during testing of her right hip.  *Id.*  Dr.

---

[16]     The GAF scale considers psychological, social and occupational functioning on a hypothetical continuum of mental health.  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (Am. Psychiatric Assoc., 4th ed. Text Revision 2000) ("DSM-IV-TR").  A GAF of sixty indicates moderate difficulty in social, occupational or school functioning.  DSM-IV-TR at 34.

Holland noted that x-rays of plaintiff's right hip were normal and that there was no radiographic evidence of arthritis. *Id.* Consistent with Dr. Bell's observations, Dr. Holland noted that x-rays of plaintiff's lumbrosacral spine showed no degenerative changes and normal space between her discs. *Id.* Dr. Holland characterized his examination of plaintiff's back as unreliable due to her refusal to perform any range of motion testing. *Id.* As part of his summary, the doctor noted that he did not "have any idea what her functional capacity" was due to her refusal to perform any range of motion testing. *Id.*

Upon remand of the matter from the Social Security Administration Appeals Council for further consideration, the ALJ referred plaintiff to Thomas Osika, Ph.D., with offices in Glens Falls, New York, for further intelligence testing. On May 8, 2006, Dr. Osika administered the Wechsler Adult Intelligence Scale–III ("WAIS-III"). AT 342-46. Plaintiff achieved a verbal IQ score of 77, a performance IQ score of 90 and a full-scale IQ score of 81, with Dr. Osika describing those results as falling within the low average range. AT 344-46. The doctor found no evidence of an Axis I clinical disorder.[17] AT 345. Dr. Osika found that plaintiff's

---

[17]  "Axis I is for reporting all the various disorders or conditions in the classification except for the personality disorders and mental retardation". *See* DSM-

GAF was 70, AT 345, which indicates "some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household) but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM-IV-TR at 34 (emphasis in original).

On May 12, 2006, Dr. Osika completed a medical source statement regarding plaintiff's ability to perform work-related activities.  AT 347-349. In it, the doctor found that plaintiff's impairment slightly affected her ability to understand, remember and carry out detailed instructions and cited her borderline verbal functioning in support of his finding.  AT 347.  Dr. Osika also found that plaintiff's impairment did not affect her ability to respond appropriately to supervision, co-workers and job-related pressure in a work setting.  AT 348.

The record contains evidence of plaintiff's daily activities.  In 2004, plaintiff reported living with her nine year old grandson.  AT 131.  Plaintiff reports that she awakens him in the morning and prepares him for school,

---

IV-TR at 27.  Such disorders can include, delirium, dementia, mental disorders, schizophrenia and other psychotic disorders, mood disorders, anxiety disorders and dissociative disorders.  *Id.*

and that during the day she walks around her home, watches television, draws pictures, and washes dishes.  AT 131-32, 464.  Plaintiff also reads to her grandson, plays board games, and otherwise visits with him.  AT 132.  Plaintiff testified that she plays word search games and assembles jigsaw puzzles, additionally identifying sewing as a hobby during her testimony.  AT 444-45.

With the help of her grandson, plaintiff is reportedly taking care of a small dog who lives with her, AT 131-33, 445, and she reports that she is able to prepare quick and easy meals twice a day.  AT 131-33, 442. Plaintiff testified that she only rarely leaves her residence and relies on her daughters to assist her with household chores; plaintiff's daughters vacuum and dust, while plaintiff launders her own clothes.[18]  AT 443.  She testified that she shops for groceries for between half-an-hour to an hour three times per month, accompanied by one of her daughters, and that occasionally she walks with her daughter in the store, while at other times she remains in the car as her daughter completes the shopping.  AT 135, 441-42.  Plaintiff testified that she enjoys smoking approximately one pack of cigarettes a day, despite the admonishments of her doctors and health

---

[18]     At the second hearing, plaintiff testified that her two daughters are cleaning her residence and that she no longer washed her clothes.  AT 464.

care professionals regarding the adverse health consequences of

smoking.  AT 446-47, 465; *see*, *e.g.*, AT 158, 237, 340, 370, 381.

II.    PROCEDURAL HISTORY

       A.    PROCEEDINGS BEFORE THE AGENCY

       Plaintiff filed an application for SSI benefits on January 30, 2004,

alleging a disability onset date of June 1, 1992.[19]  AT 82-84.  Following the

denial of that application, AT 24-27, a hearing was held on June 7, 2005,

by ALJ Thomas P. Zolezzi, at plaintiff's request, to address her application

for benefits.  AT 425-50.  By decision dated July 29, 2005, after

conducting a *de novo* review of the available evidence, ALJ Zolezzi

upheld the agency's decision denying plaintiff's application for benefits.

AT 41-50.  That determination, however, was vacated on appeal to the

Social Security Administration Appeals Council ("Appeals Council"), and

the matter was remanded for further proceedings.  AT 66-68.  In its

decision the Appeals Council noted that although the ALJ had found that

_____

[19]      When a claimant files an application during the month in which he or she
meets all the other requirements for SSI eligibility, the earliest month for which the
agency can pay benefits is the month following the month of filing the application.  If
the claimant files an application after the month in which he or she first meets all the
other requirements for SSI eligibility, the agency cannot pay her for the month during
which her application was filed or any months preceding that month.  *See* 20 C.F.R. §
416.335; *see also* 42 U.S.C. § 1382(c)(7).  Accordingly, by filing her application for SSI
on January 30, 2004, the earliest month the SSA could consider plaintiff eligible for
SSI payments would be February of 2004.

plaintiff did not meet or equal any of the listed, presumptively disabling conditions set forth in the agency's regulations, 20 C.F.R. Pt. 404, Subpt. P App. 2, in doing so the ALJ relied upon psychological testing reported by a third party source, Dr. Henel, to Dr. Welch, without any attempt to obtain a copy of Dr. Henel's report, and that the Appeals Council was unable to determine the validity of the reported IQ scores.  AT 65-68.

Following the remand, ALJ Zolezzi held a second hearing on November 27, 2006 at which time plaintiff, who was at the time represented by counsel, and Salvatore Garozzo, a vocational expert, gave testimony.  AT 451-75.  Following the conclusion of the hearing ALJ Zolezzi issued a second decision on January 17, 2007, again denying plaintiff's claim.  AT 10-22.  In his decision ALJ Zolezzi applied the now-familiar, five step test for determinating disability, first finding that plaintiff had not engaged in substantial gainful activity at any time relevant to the decision.  AT 15.  At step two, ALJ Zolezzi concluded that plaintiff suffers from several impairments significantly limiting her ability to perform work related activities, including fibromyalgia, low intellectual functioning, GERD, and COPD, but concluded that they were not, either individually or in combination, sufficiently severe to meet or equal any of the listed,

presumptively disabling impairments set forth in the regulations.  AT 15-16.

Before proceeding to step four of the disability algorithm, ALJ Zolezzi surveyed the available medical evidence and hearing testimony, and concluded that despite her conditions plaintiff retains the residual functional capacity ("RFC") to perform simple, entry level light work, adding that

> [s]he is able to lift 20 pounds Occasionally [sic] and 10 pounds frequently.  She is able to sit, stand and walk for a total of 6 hours each during an 8 hour work day with the limitations set out below. She is able to make simple decisions but no complex decisions.  She must avoid concentrated fumes, gasses, odors [sic], smoke, dust, and poor ventilation.  She can have occasional, but not frequent, bending, kneeling, and squatting.  There must be no climbing of ladders or scaffolding.  She can have occasional but not frequent lifting above shoulder level.  She must be able to change positions, using a sit/stand option every fifteen to twenty minutes.

AT 17.  In arriving at that determination ALJ Zolezzi specifically considered but rejected as exaggerated plaintiff's complaints of disabling symptomology, based in part upon the extent of her daily activities and her failure to undergo more aggressive treatment.  AT 18.  Applying his RFC findings at step four, ALJ Zolezzi concluded that plaintiff was unable to

perform any of her past relevant work.  AT 20.

Turning to step five, ALJ Zolezzi next consulted with the medical vocational guidelines set forth in the governing regulations, 20 C.F.R. Pt. 404 Subpt. P, App.2, (the "grid") for use as a framework, noting that a finding of no disability would result when plaintiff's relevant characteristics were applied to the grid.  AT 20-21.  The ALJ's resort to the grid was supplemented by testimony from the vocational expert, based upon a hypothetical posed closely approximating plaintiff's RFC, as determined by the ALJ.  AT 470-71.  Based upon the vocational expert's testimony, which revealed that given her RFC plaintiff is capable of performing available work, including as an electronics assembler and a ticket taker, ALJ Zolezzi concluded that plaintiff is not disabled.  AT 21.

ALJ Zolezzi's decision became a final determination of the agency on November 30, 2007, the date upon which the Appeals Council denied plaintiff's request for review of that opinion.  AT 5-7.

B.    THIS ACTION

Having exhausted her internal administrative remedies, plaintiff commenced this action on February 5, 2008.  Dkt. No. 1.  Issue was thereafter joined on May 27, 2008, by the Commissioner's filing of an

answer, Dkt. No. 9, preceded by the filing of a copy of the administrative transcript of the evidence and proceedings before the agency.  Dkt. No. 8. With the filing of plaintiff's brief on July 11, 2008, Dkt. No. 10, and that on behalf of the Commissioner on September 25, 2008, Dkt. No. 12, the matter is now ripe for determination, and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(d).  *See also* FED. R. CIV. P. 72(b).[20]

III.    DISCUSSION

    A.    Scope of Review

A court's review under 42 U.S.C. § 405(g) of a final decision by the Commissioner is limited; that review requires a determination of whether the correct legal standards were applied, and whether the decision is supported by substantial evidence.  *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000); *Schaal*

---

[20]    This matter has been treated in accordance with the procedures set forth in General Order No. 18 (formerly, General Order No. 43) which was issued by the Hon. Ralph W. Smith, Jr., Chief United States Magistrate Judge, on January 28, 1998, and subsequently amended and reissued by Chief District Judge Frederick J. Scullin, Jr., on September 12, 2003.  Under that General Order an action such as this is considered procedurally, once issue has been joined, as if cross-motions for judgment on the pleadings had been filed pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

*v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *Martone v. Apfel*, 70 F.Supp.2d 145, 148 (N.D.N.Y. 1999) (Hurd, J.) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  Where there is reasonable doubt as to whether the Commissioner applied the proper legal standards, his decision should not be affirmed even though the ultimate conclusion reached is arguably supported by substantial evidence.  *Martone*, 70 F.Supp.2d at 148 (citing *Johnson*, 817 F.2d at 986).  If, however, the ALJ has applied the correct legal standards and substantial evidence supports the ALJ's findings, those findings are conclusive, and the decision should withstand judicial scrutiny regardless of whether the reviewing court might have reached a contrary result if acting as the trier of fact.  *Veino*, 312 F.3d at 586; *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988); *Barnett v. Apfel*, 13 F.Supp.2d 312, 314 (N.D.N.Y. 1998) (Hurd, M.J.); *see also* 42 U.S.C. § 405(g).

The term "substantial evidence" has been defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Jasinski v. Barnhart*, 341 F.3d 182, 184 (2d Cir. 2003).  To be substantial, there must

be "'more than a mere scintilla'" of evidence scattered throughout the administrative record. *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co.*, 308 U.S. at 229, 59 S.Ct. at 217); *Martone*, 70 F.Supp.2d at 148 (quoting *Richardson* ).  "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258 (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

When a reviewing court concludes that an ALJ has applied incorrect legal standards, and/or that substantial evidence does not support the agency's determination, the agency's decision should be reversed.  42 U.S.C. § 405(g); *see Martone*, 70 F.Supp.2d at 148.  In such a case, the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), particularly if deemed necessary to allow the ALJ to develop a full and fair record or to explain his or her reasoning. *Martone*, 70 F.Supp.2d at 148 (citing *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)).  A remand pursuant to sentence six of section 405(g) is warranted if new, non-cumulative evidence proffered to the district court should be

24

considered at the agency level.  *See Lisa v. Sec'y of Dep't of Health and Human Servs. of U.S.*, 940 F.2d 40, 43 (2d Cir. 1991).  Reversal without remand, while unusual, is appropriate when there is "persuasive proof of disability" in the record and it would serve no useful purpose to remand the matter for further proceedings before the agency.  *Parker*, 626 F.2d at 235; *Simmons v. United States R.R. Ret. Bd.*, 982 F.2d 49, 57 (2d Cir.1992); *Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 644 (2d Cir. 1983).

> B.     Disability Determination-The Five Step Evaluation Process

The Social Security Act defines "disability" to include the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  In addition, the Act requires that a claimant's

> physical or mental impairment or impairments [must be] of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives, or whether a specific job vacancy exists for h[er], or whether [s]he would be hired if [s]he applied for work.

42 U.S.C. § 423(d)(2)(A).

The agency has prescribed a five-step evaluative process to be employed in determining whether an individual is disabled.  *See* 20 C.F.R. §§ 404.1520, 416.920.  The first step requires a determination of whether the claimant is engaging in substantial gainful activity; if so, then the claimant is not disabled, and the inquiry need proceed no further.  *Id.* §§ 404.1520(b), 416.920(b).  If the claimant is not gainfully employed, then the second step involves an examination of whether the claimant has a severe impairment or combination of impairments which significantly restricts her physical or mental ability to perform basic work activities.  *Id.* §§ 404.1520(c), 416.920(c).  If the claimant is found to suffer from such an impairment, the agency must next determine whether it meets or equals an impairment listed in Appendix 1 of the regulations.  *Id.* §§ 404.1520(d), 416.920(d); *see also id.* Part 404, Subpt. P, App. 1.  If so, then the claimant is "presumptively disabled."  *Martone*, 70 F.Supp.2d at 149 (citing *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984)); 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not presumptively disabled, step four requires an assessment of whether the claimant's RFC precludes the performance of

her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  If it is determined that it does, then as a final matter the agency must examine whether the claimant can do any other work.  *Id.* §§ 404.1520(g), 416.920(g).

The burden of showing that the claimant cannot perform past work lies with the claimant.  *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996); *Ferraris*, 728 F.2d at 584.  Once that burden has been met, however, it becomes incumbent upon the agency to prove that the claimant is capable of performing other work.  *Perez*, 77 F.3d at 46.  In deciding whether that burden has been met, the ALJ should consider the claimant's RFC, age, education, past work experience, and transferability of skills.  *Ferraris*, 728 F.2d at 585; *Martone*, 70 F.Supp.2d at 150.

    C.    <u>The Evidence In This Case</u>

        1.    <u>Treating Physician</u>

In support of her challenge to the Commissioner's determination, plaintiff first argues that the ALJ erred in his failure to assign controlling weight to the opinion of Dr. Beckler, to the effect that during all relevant periods she has been disabled and that in finding otherwise the ALJ overlooked contrary opinions of other treating sources, including Dr.

Welch, Dr. Wiart and Dr. Holland, regarding her limitations.

Ordinarily, the opinion of a treating physician is entitled to considerable deference, provided that it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence.  *Veino*, 312 F.3d at 588; *Barnett v. Apfel*, 13 F.Supp.2d 312, 316 (N.D.N.Y. 1998) (Hurd, M.J.).[21] Such opinions are not controlling, however, if they are contrary to other substantial evidence in the record, including the opinions of other medical experts.  *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *Veino*, 312 F.3d at 588.  Where conflicts arise in the form of contradictory medical evidence, their resolution is properly entrusted to the Commissioner. *Veino*, 312 F.3d at 588.

In deciding what weight, if any, an ALJ should accord to medical

---

[21]    The regulation which governs treating physicians provides:

Generally, we give more weight to opinions from your treating sources . . . . If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply [various factors] in determining the weight to give the opinion.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

opinions, he or she may consider a variety of factors including "[t]he duration of a patient-physician relationship, the reasoning accompanying the opinion, the opinion's consistency with other evidence, and the physician's specialization or lack thereof[.]"  *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir.1993) (discussing 20 C.F.R. §§ 404.1527, 416.927).

When a treating physician's opinions are repudiated, the ALJ must provide reasons for the rejection.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  The failure to apply the appropriate legal standards for considering a treating physician's opinions is a proper basis for reversal and remand, as is the failure to provide reasons for rejection of his or her opinions.  *Johnson*, 817 F.2d at 985-86; *Barnett*, 13 F.Supp.2d at 316-17.

Plaintiff's heavy reliance upon opinions of Dr. Beckler to support her claim of disability are misplaced.  Nowhere in the record, including the September 23, 2005 note upon which she places heavy focus, *see* AT 340, does Dr. Beckler classify plaintiff as disabled.[22]  Dr. Beckler's reference to disability appears to come in the context of plaintiff's

---

[22]     Even if Dr. Beckler, as a treating physician, were to have stated his opinion that plaintiff is disabled, that ultimate conclusion would not be entitled to special deference in light of the fact that it speaks to the ultimate issue entrusted to the Commissioner.  20 C.F.R. § 416.927(e); *see Mermelstein by Mermelstein v. Shalala*, No. 93 CV 5401, 1995 WL 62736, at *7 (E.D.N.Y. Feb. 6, 1995).

recitation of her past history to him in which, *inter alia*, she indicated that

she is "currently unemployed and has been disabled in the past."   AT

211, 340.   Plaintiff's medical records are devoid of any evidence of an

opinion by Dr. Beckler with respect to plaintiff's ability to perform work-

related activities or her level of functionality.   "The opinion of a treating

physician is not entitled to controlling weight where the opinion is not a

functional analysis."  *Gray v. Astrue*, No. 1:06-cv-0456,  2009 WL 790942,

at *8 (N.D.N.Y. Mar. 20, 2009) (Mordue, C.J.) (citing *George v. Bowen*,

692 F.Supp. 215, 219 (S.D.N.Y. 1988) (concluding that treating

physician's report was not entitled to controlling weight as it contained no

assessment of plaintiff's ability to lift and carry weight); *Hopper v. Comm'r

of Social Sec.*, No. 7:06-cv-0038, 2008 WL 724228, at *9 (N.D.N.Y. Mar.

17, 2008) (Kahn, J.) (holding that the treating physician never provided

any opinions regarding the plaintiff's ability to do work-related activities nor

his level of disability, thus the ALJ did not err in failing to discuss what

weight should be given to the treating physician's findings as none of

those findings described the plaintiff's limitations).

   Plaintiff also offers opinions of Dr. Welsh, Dr. Wiart and Dr. Holland

as those of treating sources further supporting her claim of disability.

Careful analysis of the opinions of those professionals, however, reveals that they too fail to support plaintiff's argument.

It is true that in February of 1999 Dr. Welsh restricted plaintiff to pushing, pulling, and lifting no more than two pounds, and without use of her hands above shoulder height more than one to two times per hour. AT 151.  As the ALJ noted, however, plaintiff has not treated with Dr. Welsh since February of 1999, five years prior to her eligibility for SSI benefits.  *See* AT 19.  It should also be noted that in that report Dr. Welsh recommended that plaintiff be referred for vocational training "to see if she could be trained to do menial tasks that are light weight and non-repetitive."  AT 151.  Dr. Welsh's findings, in addition to being remote in time, thus fail to support plaintiff's claim of disability.

Plaintiff's treating source argument fares no better when the records of Dr. Wiart are considered.  In examinations dating back nearly a decade prior to plaintiff's eligibility for SSI, Dr. Wiart evaluated plaintiff and assessed her employability for purposes of social services benefits.  AT 159-66.  As noted in the ALJ's decision, on July 14, 1995, Dr. Wiart commented that he could not "document [a] physical basis for not being employable," and in August and November of 1996, in fact, approved

31

plaintiff for light duty work.  AT 19, 159-60, 165.  In short, Dr. Wiart's

assessments are not inconsistent with the ALJ's finding that plaintiff could

perform light work with additional non-exertional restrictions.

Dr. Holland's opinion similarly fails to lend support to plaintiff's claim

of disability.  At the outset it should be noted that Dr. Holland, having

examined the plaintiff once in June of 2004, does not qualify as a treating

source.  *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983).

Moreover, as his report discloses, Dr. Holland's examination of plaintiff's

back was unreliable due to her refusal to perform any range of motion

testing.  AT 191.  Plaintiff's failure to cooperate at the examination and Dr.

Holland's resulting inability to provide an accurate RFC assessment

deprived him of the opportunity to render a meaningful opinion regarding

plaintiff's condition.  Accordingly, Dr. Holland's report of his examination

does not support plaintiff's treating source argument.[23]

In sum, the ALJ's decision not to accord Dr. Beckler's opinion

controlling weight, and his rationale for not crediting Dr. Welsh's opinions,

---

[23]     In his opinion, the ALJ cited Dr. Holland's observations that plaintiff's
heel-to-toe walking strength was intact, that she did not exhibit any significant antalgic
gait, that her hips' range of motion was normal, that x-rays of plaintiff's right hip were
normal and that there was no radiographic evidence of arthritis.  The ALJ further noted
that Dr. Holland was unable to assess plaintiff's RFC due her refusal to cooperate with
a number of tests.  AT 20; *see* AT 191.

to the extent that they may be inconsistent with his determination of no disability, were properly explained and are supported by substantial evidence.

### 2. Plaintiff's Credibility

In arriving at his determination, the ALJ noted that plaintiff's claims regarding her disabling symptoms were not fully credible.   AT 18-19. Within her argument challenging the weight assigned by the ALJ to the opinions of Dr. Beckler, plaintiff claims that the ALJ committed error in dismissing plaintiff's complaints of chronic pain in her hips and lower back, a claim which the court understands as a challenge to the ALJ's assessment of her credibility.

It is well within the discretion of the Commissioner to evaluate the credibility of a plaintiff's complaints and render an independent judgment in light of the medical findings and other evidence.  *See Mimms v. Heckler*, 750 F.2d 180, 185-86 (2d Cir. 1984); Social Security Ruling ("SSR") 96-7p, 1996 WL 374186, Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements (S.S.A. 1996).  "Since symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical

evidence alone," all information submitted by a claimant concerning his or her symptoms must be considered.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).  The claimant's testimony alone carries independent weight; to require a claimant to fully substantiate his or her symptoms with "medical evidence would be both in abrogation of the regulations and against their stated purpose."  *Matejka v. Barnhart*, 386 F.Supp.2d 198, 207 (W.D.N.Y. 2005) (citing *Castillo v. Apfel*, No. 98 CIV. 0792, 1999 WL 147748, at *7 (S.D.N.Y. Mar. 18, 1999)).

The regulations prescribe a specific process that the ALJ is to follow in weighing a claimant's testimony.  The ALJ must first establish that there is a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms.  20 C.F.R. §§ 404.1529(b), 416.929(b).  If the ALJ finds such an impairment, then the ALJ next evaluates the intensity and persistence of the symptoms to determine how the symptoms limit the claimant's functioning.  20 C.F.R. §§ 404.1529(c), 416.929(c).

A claimant's testimony is entitled to considerable weight when it is consistent with and supported by objective clinical evidence demonstrating that the claimant has a medical impairment which one

34

could reasonably anticipate would produce such symptoms.  *Barnett*, 13

F. Supp. at 316; *see also* 20 C.F.R. §§ 404.1529(a), 416.929(a).  If clinical

evidence does not fully support the claimant's testimony concerning the

intensity, persistence, or functional limitations, then the ALJ must consider

additional factors, including: (1) daily activities; (2) location, duration,

frequency, and intensity of any symptoms; (3) precipitating and

aggravating factors; (4) type, dosage, effectiveness, and side effects of

any medications taken to relieve symptoms; (5) other treatment received;

and 6) any other measures taken to relieve symptoms.  20 C.F.R. §§

404.1529(c)(3)(i)-(vi), 416.929(c)(3)(i)-(vi).

     After considering plaintiff's subjective testimony, the objective

medical evidence, and any other factors deemed relevant, the ALJ may

accept or reject a claimant's subjective testimony.  *Martone*, 70 F.Supp.2d

at 151; *see also* 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).  Although the

ALJ is free to accept or reject such testimony, a "finding that the witness is

not credible must nevertheless be set forth with sufficient specificity to

permit intelligible plenary review of the record."  *Williams*, 859 F.2d at

260-61 (citation omitted).  Where substantial evidence supports the ALJ's

findings, the decision to discount subjective testimony may not be

disturbed on court review.  42 U.S.C. § 405(g); *Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (citations omitted).

Despite its elusiveness and potentially debilitating effects, fibromyalgia, like many other medical conditions, is one which may be, but is not necessarily, so limiting as to qualify as disabling under the Act.  *See Coyle v. Apfel*, 66 F.Supp.2d 368, 376-77 (N.D.N.Y. 1999) (Hurd, J.).  A diagnosis of fibromyalgia does not translate into an automatic finding of disability; it is not the presence of such a medical condition, but rather its limitations, which inform the question of whether or not a plaintiff is under a disability.  *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003); *Alvarez v. Barnhart*, No. 03 Civ. 8471, 2005 WL 78591, at *2 (S.D.N.Y. Jan. 12, 2005) (citing, *inter alia*, *Mongeur*, 722 F.2d at 1037).

In arriving at plaintiff's RFC, the ALJ found that while plaintiff's medically determinable impairments "could reasonably be expected to produce [her] alleged symptoms, . . . [her] statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible."  AT 18.  While the ALJ's recitation of the factors leading him to reject, in part, plaintiff's subjective claims is less than comprehensive, it

nonetheless sets forth in summary fashion the basis for his determination, which draws the support of substantial evidence.  The ALJ noted that despite plaintiff's allegations of disabling symptoms and limitations, the record reveals that plaintiff has been able to walk on her heels and toes without difficulty and that her ambulation is normal.  AT 18; *see* AT 191, 340.  ALJ Zolezzi also noted that plaintiff refused treatment recommended by Dr. Beckler.  AT 18.  The ALJ observed that plaintiff has not received treatment on a regular basis, and has sought treatment for pain only three times since September of 2005, "one of which was to have disability paper work completed."  AT 18.  The ALJ further noted that plaintiff takes only over-the-counter Tylenol for her pain, and has not taken any prescription medication in four to five years.  AT 18; *see* AT 211.

The ALJ also examined plaintiff's daily activities and found that they were inconsistent in their extent with her complaints of disabling symptoms and limitations.  AT 18-19.  The ALJ noted that plaintiff shops with her daughter for between thirty and sixty minutes, cooks meals and washes dishes, does her own laundry, plays cards and word search games, assembles jigsaw puzzles, draws with her grandchildren; and sews shirts and makes craft dolls.  *Id.*  The ALJ also noted that plaintiff

takes care of her grandson, a dog and a bird.  AT 18; *see* AT 131-33, 135, 441-45, 464.

After consideration of these facts, I conclude that the ALJ's rejection of plaintiff's subjective complaints is properly articulated, and draws the support of substantial evidence.

### 3.   Combined Effect of Plaintiff's Impairments

Plaintiff next contends that the ALJ failed to consider her physical limitations in combination with her mental limitations, and that his decision reflects a complete misunderstanding of the nature of her intellectual functioning and the pain related to her impairments.  Plaintiff argues that regardless of her IQ, and testing by Dr. Osika finding her cognitive ability to fall within the low average range, her borderline intelligence and learning disabilities, when considered in conjunction with her lack of a high school diploma and/or GED as well as her longstanding absence from the workforce, warrant a finding that she is disabled.  Defendant labels plaintiff's argument as baseless and inexplicable.

The Second Circuit has long recognized that "the combined effect of a claimant's impairments must be considered in determining disability; the SSA must evaluate their combined impact on a claimant's ability to work,

regardless of whether every impairment is severe." *Dixon v. Shalala*, 54
F.3d 1019, 1031 (2d Cir. 1995) (citations omitted); *see* 20 C.F.R. §§
404.1523, 416.923.  The ALJ's decision in this case shows that he
satisfied this requirement.  ALJ Zolezzi's decision states that "the claimant
has the following severe combination of impairments: fibromyalgia, low
intellectual functioning, GERD and [COPD] . . . ."  AT 15.  His decision
further notes that [t]he claimant does not have an impairment or
combination of impairments that meets or medically equals one of the
listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 . . . ."[24]
AT 16. The ALJ next addressed plaintiff's argument that her combination
of impairments meet listing 12.05(c).[25]  He noted that the record contained

---

[24]     In addition to these severe impairments, the ALJ also noted that plaintiff
had undergone two surgical procedures to remove basal cell carcinoma from her
upper lip.  AT 15.  The surgeries were successful, and plaintiff required neither
chemotherapy nor radiation.  *Id.*  The ALJ also considered plaintiff's claim that she
suffers from rheumatoid arthritis, but noted that Dr. Beckler found no clear support for
such a diagnosis.  AT 15; *see* AT 340.  Similarly Dr. Markowitz and Dr. Holland
concluded that there was "no radiographic evidence of arthritis" in plaintiff's right hip,
AT 187, 191.

[25]     Listing 12.05(c) provides that

Mental retardation refers to significantly subaverage
general intellectual functioning with deficits in adaptive
functioning initially manifested during the developmental
period; *i.e.*, the evidence demonstrates or supports onset of
the impairment before age 22.

The required level of severity for this disorder is met when

no proof that plaintiff's IQ fell within the mentally retarded range prior to age 22.  AT 16, *see* AT 470-71 (ALJ: "If I looked at the 67 [plaintiff's full-scale IQ score as determined by Dr. Henel], do we have any proof that this existed before she was age 22?"  Plaintiff's Counsel: "No.  No Your Honor.").  The ALJ emphasized plaintiff's testimony that she had attended regular classes while enrolled in school and dismissed Dr. Henel's report from 1998[26] and indicated that, pursuant to the Appeals Council's remand order, he had sought further clarification regarding plaintiff's mental limitations.  The ALJ recited the scores plaintiff obtained on the WAIS-III test administered by Dr. Osika: full scale IQ score of 81; verbal IQ score of 77; and a performance IQ score of 90, all of which were consistent with a low average range of intellectual functioning.  AT 16; *see* AT 344.  The ALJ noted that none of plaintiff's IQ scores fell within the 60 to 70 range as required by listing 12.05(c).  He further noted that the record did "not

---

the requirements in A, B, C, or D are satisfied.

A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

[26]    The ALJ referred to an "old report from 1999."  AT 16.  The record, however, contains no evidence of a report pertaining to plaintiff's IQ from 1999.  Dr. Henel's report from 1998 is the older of the two reports in the record pertaining to plaintiff's mental capacity.

establish marked limitations in activities of daily living, social functioning,

or in maintaining concentration, persistence or pace." AT 16. That the

ALJ considered the combined effect of plaintiff's impairments is further

revealed by his RFC determination in which he assessed both mental and

physical limitations experienced by plaintiff.

From his decision and the foregoing it is evident that contrary to

plaintiff's argument regarding the matter, the ALJ did consider the

combined effect of plaintiff's impairments, with due regard to their

respective degrees of severity, when considering the question of disability.

### 4. The ALJ's RFC Determination

In his decision, the ALJ found that from an excertional point of view

plaintiff has the RFC to perform simple, entry-level light work, with certain

added restrictions previously noted.[27]  Addressing plaintiff's mental

───────────────────

[27]    By regulation light work is defined as follows:

> Light work involves lifting no more than 20
> pounds at a time with frequent lifting or
> carrying of objects weighing up to 10 pounds.
> Even though the weight lifted may be very
> little, a job is in this category when it requires
> a good deal of walking or standing, or when it
> involves sitting most of the time with some
> pushing and pulling of arm or leg controls.  To
> be considered capable of performing a full or
> wide range of light work, you must have the
> ability to do substantially all of these activities.
> If someone can do light work, we determine

limitations, the ALJ found that she is able to make simple but not complex decisions.  With respect to environmental limitations, the ALJ noted that plaintiff's work must not subject her to concentrated fumes, gases, odors, dust and poor ventilation.  AT 17.  From this it is readily apparent the ALJ recognized that plaintiff did not retain the RFC to perform the full-range of light work.  In this action plaintiff challenges the RFC finding, although it is unclear as to which specific elements, she contends, are not well supported.

A claimant's RFC represents a finding of the range of tasks she is capable of performing notwithstanding the impairments at issue.  20 C.F.R. §§ 404.1545(a), 416.945(a).  Consideration of a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis all inform an RFC determination.  *Id*.; *Martone*, 70 F.Supp.2d at 150.

---

that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

To properly ascertain a claimant's RFC, an ALJ must therefore assess her exertional capabilities, addressing her ability to sit, stand, walk, lift, carry, push, and pull.  20 C.F.R. §§ 404.1545(b), 404.1569a, 416.945(b), 416.969a.  The ALJ must also consider nonexertional limitations or impairments, including impairments that result in postural and manipulative limitations.  20 C.F.R. §§ 404.1545(b), 404.1569a, 416.945(b), 416.969a; *see also* 20 C.F.R. Part 404, Subpt. P, App. 2 § 200.00(e).  When making an RFC determination, an ALJ must specify those functions that the claimant is capable of performing; conclusory statements concerning his or her capabilities, however, will not suffice. *Martone*, 70 F.Supp.2d at 150 (citing *Ferraris*, 728 F.2d at 587).  An administrative RFC finding can withstand judicial scrutiny only if there is substantial evidence in the record to support each requirement listed in the regulations.  *Martone*, 70 F.Supp.2d at 150 (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990) (McAvoy, J.)); *Sobolewski v. Apfel*, 985 F. Supp. 300, 309-10 (E.D.N.Y. 1997).

The mental component of the ALJ's RFC determination finds the support of substantial evidence in the record, which was adequately described in his decision.  In finding that plaintiff was able to make simple

but not complex decisions, the ALJ relied heavily on the report of Dr. Osika.  Dr. Osika administered a WAIS-III test to plaintiff on May 8, 2006, finding that plaintiff's cognitive ability could fairly be characterized as low average.  AT 17; *see* AT 342, 346.  The ALJ cited the results of the WAIS-III testing and Dr. Osika's opinion that plaintiff has no limitations with respect to her ability to respond appropriately to supervision, co-workers and work pressures and the absence of any Axis I diagnosis.  ALJ Zolezzi also cited Dr. Osika's opinion that plaintiff has slight limitations in her ability to understand, remember and carry out detailed instructions.  AT 17; *see* AT 345, 347, 348.  Substantial evidence supports the ALJ's determination regarding the limitations imposed by plaintiff's mental conditions.

Turning to the physical component of the ALJ's RFC assessment, the record contains some evidence supporting the ALJ's determination that plaintiff can perform light work.  As was noted above, on July 14, 1995, Dr. Wiart commented that he could not "document [a] physical basis for not being employable," and indeed in August and November of 1996 approved plaintiff for light duty work.  AT 159-60, 165.  Moreover, as was also noted above, the ALJ also examined plaintiff's daily activities and

found that they were inconsistent with her complaints of disabling symptoms and limitations.  Some of plaintiff's activities, such as caring for her grandson, caring for her dog and doing her own laundry, might suggest an ability to perform light work.  AT 18; *see* AT 131-32, 443.

The record, however, contains neither a physical RFC assessment nor a medical source statement pertaining to plaintiff's physical capabilities, let alone one from a treating source.[28]  When critical record voids exist, an ALJ is duty bound to take measures to complete the record and fill the perceived gaps.  *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996); *Echevarria v. Sec'y of Health and Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982).

To a degree, efforts to supplement the record In this case were

---

[28]     It is true that an agency disability analyst completed an RFC assessment with respect to plaintiff.  AT 193-98.  Such a consultant, however, is not an acceptable medical source, *Dejesus v. Barnhart*, No. 06-cv-6044, 2007 WL 528895, at *7 (W.D.N.Y. Feb. 13, 2007), and for that reason the assessment was accorded only slight weight by the ALJ.  *See* AT 19.  The regulations limit acceptable medical sources to licensed physicians (medical or osteopathic doctors), licensed or certified psychologists and licensed optometrists, for purposes of establishing visual disorders only, licensed podiatrists, for purposes of establishing impairment of the foot and ankle only and qualified speech-language pathologists, for purposes of establishing speech or language impairments only.  20 C.F.R. § 404.1513(a) and 416.913(a).  The regulations also provide that the agency may use evidence from other sources to show how a claimant's impairments affect his ability to work.  The regulations include a non-exhaustive list of "other sources," which include medical sources such as nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists and therapists.  20 C.F.R. § 416.913(d)(1).

hampered by circumstances beyond the ALJ's control.  The ALJ sent a letter requesting that Dr. Wiart complete an attached medical source statement regarding plaintiff's ability to do work-related physical activities. Dr. Wiart, however, apparently never completed the form.  *See* AT 199-202.  The inability of Dr. Holland to determine plaintiff's RFC, based upon his examination, was due to plaintiff's refusal to cooperate with disability examination testing.  Significantly, however, there is no evidence in the record that the ALJ attempted to re-contact Dr. Beckler, who noted that it was "difficult for [plaintiff] physically to do work."  AT 340.

"The duty to develop the record is 'particularly important' when obtaining information from a claimant's treating physician due to the 'treating physician' provisions in the regulations."  *Dickson v. Astrue*, No. 1:06-cv-0511, 2008 WL 4287389, at *13 (N.D.N.Y. Sept. 17, 2008) (Mordue, C.J.) (citing *Devora v. Barnhart*, 205 F.Supp.2d 164, 172 (S.D.N.Y. 2002).  This duty includes an affirmative obligation to make reasonable efforts to obtain from a claimant's treating physicians any necessary reports, including an assessment of his or her RFC.  *Id.*; 20 C.F.R. § 404.1512(e).

The record in this contains no assessment from a treating source

quantifying plaintiff's physical capabilities, and thus there is no basis upon which the court can find that substantial evidence supports the ALJ's light work RFC determination.  *See Stephens v. Astrue*, No. CA 08-0163-C 2008 WL 5233582, at *3 (S.D.Ala. Dec. 15, 2008); *Vigo Ramos v. Comm'r of Soc. Sec. Admin.*, 241 F.Supp.2d 139, 142 (D.Puerto Rico 2003) (explaining that "absent a residual functional capacity assessment from an examining psychiatrist [or physician], we do not think that [an] ALJ is equipped to conclude that [a] claimant's condition [presents] no significant limitation on ability to work.") (alterations in original) (quoting *Rivera-Figueroa v. Sec'y of Health and Human Servs.*, 858 F.2d 48, 52 (1st Cir. 1988)).  The ALJ's failure to re-contact Dr. Beckler in an attempt to obtain an RFC or medical source statement constitutes a breach of the ALJ's duty to develop the record, and provides a basis for remand.  *See Hopper*, 2008 WL 724228, at *11 (remanding, in part, because the ALJ failed to re-contact claimant's treating physicians after noting that the record did not contain an RFC or medical source statement from any of claimant's treating physicians); *Dickson*, 2008 WL 4287389, at *13 (remanding, in part, for failure to re-contact claimant's treating physician to request an RFC assessment); *Garrett v. Astrue*, No. 05-cv-6524, 2007 WL 4232726,

at *9 (W.D.N.Y. Jul. 18, 2007) (questioning the fact that the record

contained no RFC assessments from any of claimant's treating physicians

and remanding the case with instructions that the ALJ obtain RFC

assessments from claimant's treating physicians that quantify plaintiff's

exertional impairments).  Based on this deficiency, I recommend that the

case be remanded to allow the ALJ to fulfill his obligation to develop the

record by requesting a physical RFC assessment or medical source

statement from Dr. Beckler or some other acceptable medical source.

        5.    Step Five Determination

    Plaintiff's final argument surrounds the ALJ's step five

determination.  Plaintiff maintains that the Commissioner failed to carry his

burden at step five to establish the existence of available work capable of

being performed by the plaintiff, given her limitations and that when her

characteristics are applied to the grid, a finding of disability is warranted.

    Ordinarily, the Commissioner can meet his burden in connection

with the fifth step of the relevant disability test by utilizing the grid.  *Rosa

v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999); *Bapp v. Bowen*, 802 F.2d

601, 604 (2d Cir. 1986).  The grid takes into consideration a claimant's

RFC, as well as his or her age, education and work experience, in order to

48

determine whether he or she can engage in substantial gainful work in the national economy.  *Rosa*, 168 F.3d at 78.  Whether or not the grid should be applied in order to make a step five determination presents a case-specific inquiry which depends on the particular circumstances involved. *Bapp*, 802 F.2d at 605.  If a plaintiff's situation fits well within a particular classification, then resort to the grid is appropriate.  *Id.*  If, on the other hand, nonexertional impairments, including pain, significantly limit the range of work permitted by exertional limitations, then use of the grid is inappropriate, in which case further evidence and/or testimony is required.[29]  *Rosa*, 168 F.3d at 78; *Bapp*, 802 F.2d at 605-06.

In this instance, while noting that with a capacity to perform a full range of light work, plaintiff would be deemed "not disabled" by Rule 202.18 of the grid, the ALJ elicited opinion testimony from a vocational expert in light of plaintiff's inability to perform a full range of light work and the resulting erosion of the job base upon which the grid is predicated .

---

[29]     As one court has explained,

> [a] nonexertional limitation is one imposed by the claimant's impairments that affect [his or] her ability to meet the requirements of jobs other than strength demands, and includes manipulative impairments and pain.

*Sobolewski v. Apfel*, 985 F. Supp. 300, 310 (E.D.N.Y. 1997) (citing 20 C.F.R. § 404.1569(a), (c)).

It is well-established that elicitation of testimony from a vocational expert is a proper means of fulfilling the agency's burden at step five of the disability test to establish the existence of jobs in sufficient numbers in the national and regional economy that plaintiff is capable of performing. *Bapp*, 802 F.2d at 604-05; *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983); *Dwyer v. Apfel*, 23 F. Supp. 2d 223, 229-30 (N.D.N.Y. 1998) (Hurd, M.J.) (citing *Pratts*, 94 F.3d at 39); *see also* 20 C.F.R. §§ 404.1566, 416.966.  Use of hypothetical questions to develop the vocational expert's testimony is also permitted, provided that the questioning precisely and comprehensively includes each physical and mental impairment of the claimant accepted as true by the ALJ.  *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).  If the factors set forth in the hypothetical are supported by substantial evidence, then the vocational expert's testimony may be relied upon by the ALJ in support of a finding of no disability.  *Id.*

As can be seen, the opinion of a vocational expert hinges upon the hypothetical posed and whether it closely approximates plaintiff's capacity. In this instance, since I have already concluded that the ALJ's RFC determination, to the extent of  its physical elements, is not supported by

50

substantial evidence, the vocational expert's testimony is therefore similarly infected.[30]

IV.   SUMMARY AND RECOMMENDATION

In arriving at his determination of no disability, the ALJ gave appropriate consideration to the opinions of plaintiff's treating sources properly assessed plaintiff's credibility, and appropriately considered the combined effects of plaintiff's impairments in combination with one another.  The ALJ's physical RFC determination, however, fails to find the support of substantial evidence, and, in particular, any physical RFC assessment from either plaintiff's treating physicians, or an acceptable medical source.  Accordingly, it is hereby respectfully

RECOMMENDED that plaintiff's motion for judgment on the pleadings be GRANTED, the Commissioner's determination of no disability VACATED and the matter REMANDED to the agency for further consideration.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge

---

[30]      As plaintiff notes, when the vocational expert was asked by the ALJ to assume that she is capable of performing only sedentary work with the same other limitations, he testified that there were no jobs available that plaintiff could perform. AT 473.  The physical components of the ALJ's RFC determination were therefore critical to the step five determination.

written objections to the foregoing report. Such objections shall be filed

with the Clerk of Court within ten (10) days. FAILURE TO SO OBJECT TO

THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. §

636(b)(1) (2006); FED. R. CIV .P. 6(a), 6(d), 72; *Roldan v. Racette*, 984

F.2d 85 (2d Cir. 1993).

IT IS FURTHER ORDERED that the Clerk of the Court serve a copy

of this report and recommendation upon the parties in accordance with

this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:       August 17, 2009

             Syracuse, NY